# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ALFRED GUERRERO MENDOZA and | § | |
| HERMELINDO GUERRERO ESTRADA, | § | |
| on behalf of themselves and others similarly | § | |
| situated | § | |
| | § | |
| v. | § | CASE NO. 4:12-CV-562 |
| | § | |
| A&A LANDSCAPE AND IRRIGATION, LP | § | |
| and DAVID ANDERTON | § | |

## ORDER GRANTING PLAINTIFFS' EMERGENCY MOTION FOR SANCTIONS

Pending before the Court is Plaintiffs' Emergency Motion for Sanctions (Dkt. #33). After considering the motions, and the evidence and argument presented by counsel at a hearing beginning on September 23, 2013 and continuing on September 27, 2013, the Court finds Plaintiffs' motions should be granted.

## BACKGROUND[1]

The facts of this motion arise out of Plaintiffs' August 13, 2013, notice of filing additional consents (Dkt. #27), which contained the purported consent of Asael Salazar Aguado ("Mr. Salazar") as Exhibit 6.

On August 30, 2013, Plaintiffs filed their motion for leave to file additional consents, which requested that the Court grant their request to file the consents for additional opt-in Plaintiffs J. Santos Perez Balderas, Juan Roberto Balderas G., Marco Antonio Ruiz, and Pedro Sanchez (Dkt. #30).  In addition, Plaintiffs submitted the resigned consent of Mr. Salazar with his signature on the correct page.  Although the deadline to file a Notice of Consent expired on August 11, 2013, Plaintiffs requested leave to file these additional consents based on the fact that

---

[1] The Court will recite the facts in chronological order to the best of its ability after hearing testimony regarding the events at the hearing on September 23, 2013, and September 27, 2013.

the consents were not received until August 28, 2013, and Defendants failed to provide Plaintiffs with a complete list of laborers.

Defendants opposed this request and filed a response to the motion for leave on September 4, 2013, alleging that Plaintiffs had not established that Plaintiffs failed to act because of "excusable neglect" (Dkt. #32).  Defendants contended that in order to show excusable neglect "a movant must show good faith and a reasonable basis for noncompliance."  *Id*.  Defendants also suggested to the Court that the opt-in plaintiff consents filed with this Court and attached to Plaintiffs' motion were the result of fraud.  Specifically, Defendants argued that "someone, presumably one of the original plaintiffs, is forging the signatures of former A&A employees to the Consent to Join Collective Action Lawsuit forms… and then submitting such forged documents to opposing counsel for submission to this court."  *Id*. at 2.  Defendants' motion claims that Mr. Salazar and Marco Antonio Ruiz ("Mr. Ruiz"), both opt-in plaintiffs with consents filed with Plaintiffs' motion, came forward and stated that they did not execute the consent, did not authorize another to execute the consent, and do not wish to participate in the lawsuit.  Defendants also filed an affidavit to that effect, attached to their motion as exhibits 1 and 2.

On September 16, 2013, Plaintiffs filed their emergency motion for sanction (Dkt. #33).  In their motion, Plaintiffs allege that in an attempt to avoid liability under the Fair Labor Standards Act ("FLSA"), Defendants are communicating with opt-in plaintiffs who are currently employed by Defendants "for the purpose of coercing them into waiving their rights under the FLSA."  *Id*. at 1. Plaintiffs alleged that Defendants contacted opt-in Plaintiffs, specifically Mr. Salazar and Mr. Ruiz, to question them regarding their participation in this case.  Plaintiffs assert that these employees are working in the United States under H2-B visas, which prohibit them

from working in this country for any employer other than Defendants.  Many of these employees also live on Defendants' property, and, thus, their employment, visa status, and homes are completely in the hands of Defendants.  Plaintiffs contend that Mr. Salazar and Mr. Ruiz were confronted by Defendant David Anderton ("Mr. Anderton"), regarding their participation in this lawsuit.  Plaintiffs argued that Mr. Anderton stated that if Mr. Salazar and Mr. Ruiz wanted to fight against the company, they were not needed in the company.  Mr. Salazar informed his counsel that he feared that if he did not sign the affidavit given to him by Mr. Anderton, that he would lose his job and be deported to Mexico.  Therefore, Mr. Salazar signed an affidavit wherein he retracted his consent to join this lawsuit as an opt-in plaintiff.  Plaintiffs requested that the Court enter an order prohibiting Defendants from having any further communications with opt-in plaintiffs regarding the lawsuit, and prevent Defendants from taking any adverse actions against opt-in plaintiffs during the lawsuit.  Plaintiffs also requested that the Court order Defendants to pay all reasonable attorneys' fees and expenses accrued in connection with the motion.

On September 17, 2013, the Court held a telephone conference regarding the appropriate procedure for addressing the relief requested in Plaintiffs' motion.   During the telephone conference, counsel for Defendants articulated that Mr. Salazar and Mr. Ruiz had come forward voluntarily to tell Defendants that they did not wish to participate in the lawsuit and did not execute the consent forms.  The parties agreed that an evidentiary hearing was necessary, and the Court set the matter for hearing on September 23, 2013 (Dkt. #35).   In addition, the Court ordered Defendants to file a response to Plaintiffs' emergency motion for sanction no later than Friday, September 20, 2013, at 11:59 p.m.  *Id*.  No response was filed.

At the hearing on September 23, 2013, in his opening statement, counsel for Defendant indicated that upon receipt of Plaintiffs' motion for leave to file additional consents, Mr. Anderton conducted an analysis of the signatures and the paychecks that the opt-in plaintiffs received, and he concluded that the signatures were not the same.  Counsel for Defendant indicated that after this analysis was done, Mr. Anderton had a good faith basis to have his foreman, Reuben Landaverde ("Mr. Landaverde"), ask Mr. Salazar and Mr. Ruiz if they signed the consents.  Counsel for Defendant argued that Mr. Salazar reported to Mr. Landaverde that he did not sign the consent.  Counsel for Defendant asserted that, at that time, Mr. Anderton had a reasonable basis to approach Mr. Salazar and Mr. Ruiz, and ask them to sign the affidavit waiving their rights under the FLSA.

Mr. Salazar testified that he works for A&A and that Mr. Anderton is his boss.  He has worked for A&A for two years, and his schedule is Monday through Saturday, from 7 a.m. to 8 p.m. He stated that he is paid $9.00/hour every two weeks, depending on how many hours he works during that period.  Mr. Salazar testified that he is currently working in San Antonio, and that Mr. Ruiz is one of his co-workers at that job site.  They live at a hotel while he is working in San Antonio, and the other workers live there too.  Mr. Salazar testified that he signed both the original consent filed with the Court on August 12, 2013, and the second consent filed with the Court on August 30, 2013.  Mr. Salazar testified that he signed both documents voluntarily, and that he wanted to sign them so that "everything will be right" and he can get paid what he is owed.  At the time he signed the document, Mr. Ruiz and two others were present.  In addition, Mr. Salazar testified that he was present when Mr. Ruiz signed his consent form.

Mr. Salazar stated that no one approached him to discuss the lawsuit, until September 4, 2013, when Mr. Anderton approached him and gave him an affidavit to sign.  Mr. Salazar stated

4

that he never told anyone that he wanted to terminate his consent to participate in the lawsuit. Mr. Salazar stated that Mr. Anderton, along with Mr. Landaverde and Maria Hankey, Defendants' notary, approached both Mr. Salazar and Mr. Ruiz on the San Antonio job site.  Mr. Anderton spoke Spanish during the meeting, and Mr. Salazar stated that Mr. Anderton told them that there was a problem.  Mr. Anderton asked Mr. Salazar and Mr. Ruiz if they had signed the consents, and stated that if they had signed the agreement, then they were against the company. Mr. Salazar testified that Mr. Anderton told them that if they agreed to participate in the lawsuit that Mr. Anderton was going to give them their last check and send them to Mexico.  Mr. Salazar testified that at that time, he was afraid for his job and believed that he would be deported if he didn't sign the affidavit Mr. Anderton gave him.  Mr. Salazar testified that he and Mr. Ruiz signed the affidavit differently because they were scared.  In addition, Mr. Salazar testified that his primary language is Spanish, that he cannot read English, and he could not read the affidavit. Mr. Salazar testified that he does not know what the affidavit says.

Mr. Salazar testified that after that date, he was told by Mr. Landaverde that he could not work more than 8 hours per day, even though all the other workers on his crew are permitted to work overtime if they choose to do so.   Mr. Salazar testified that he believed his hours and pay were being cut because of his participation in this lawsuit.  Mr. Salazar testified that he also receives money for meals and housing while in San Antonio, and the last check he received $200 while all other individuals received $300.

Mr. Salazar testified repeatedly that he signed the affidavit, even though he knew it was a lie, because he was afraid for his job and did not want to have any problems with his boss.

Mr. Anderton also testified at the hearing on September 23, 2013 and continued testifying on September 27, 2013.  Mr. Anderton is President of A&A, and he knows and works with Mr.

Salazar and Mr. Ruiz.  Mr. Anderton first testified that on August 13, 2013, he received an email of participants in the lawsuit and consent forms for each.  Mr. Anderton noted that the only two participants in the lawsuit who were still employees of Defendants were Mr. Salazar and Mr. Ruiz, so Mr. Anderton asked his foreman, Mr. Landaverde, to check with Mr. Salazar to see if he signed his consent form or did someone sign it for him.  Mr. Landaverde reported to Mr. Anderton that Mr. Salazar stated he did not sign the consent form.  Then, Mr. Anderton testified that he received a second request to join the lawsuit from Mr. Salazar, and Mr. Anderton again asked Mr. Landaverde to confirm with Mr. Salazar that he wanted to participate in the lawsuit. Mr. Landaverde again reported to Mr. Anderton that Mr. Salazar did not sign the consent and did not want to participate in the lawsuit.

Mr. Anderton then traveled to the job site in Uvalde, Texas, where Mr. Salazar and Mr. Ruiz were currently assigned to work.  Mr. Anderton also took Maria Hankey with him as a notary.  When he arrived at the job site, Mr. Anderton asked Mr. Landaverde where Mr. Salazar and Mr. Ruiz were working.  Mr. Anderton testified that when he got there, both gentleman put their hands up and said that they did not want to be part of any lawsuit and did not want to sign any forms.  Mr. Anderton testified that he told them they were a part of the lawsuit, and if they wanted to opt-out, they could sign the affidavit he provided them.  Mr. Salazar and Mr. Ruiz both signed the affidavits, and Mr. Anderton testified that he read the affidavits to them in Spanish.

On cross-examination, Mr. Anderton revealed that he has never had a conversation with either Mr. Salazar or Mr. Ruiz, other than saying hello and acknowledging each other before that day when he asked them to sign the affidavit waiving their rights under the FLSA.  Mr. Anderton testified that Mr. Lynn drew up the affidavit, and he did so without speaking to Mr. Salazar,

using facts provided to him by Defendants.   Mr. Anderton testified that all member of Mr. Salazar's crew work more than 40 hours a week, but Mr. Salazar was instructed to work no more than 40 hours a week.   Mr. Anderton stated that because Mr. Salazar has expressed concern that he was not being paid his complete overtime pay, then his solution is to not allow Mr. Salazar to work overtime.

On September 27, 2013, Mr. Anderton continued his testimony.   On this date, Mr. Anderton testified that he did not compare any of the signatures of Mr. Salazar, but that he decided it would be a good idea to ask him about the consent to find out if it was his intent to join the lawsuit.  Mr. Anderton testified that he had no reason to question the document when he first saw it.  Mr. Anderton stated that the meeting with Mr. Salazar and Mr. Ruiz were working at the job site when he arrived.  Mr. Anderton interrupted their work, called them aside, and conducted the meeting with the two of the in the courtyard standing next to a breezeway.  Mr. Anderton did not know if the notary administered an oath to the witnesses.

Mr. Anderton testified that Mr. Salazar did not want to work a half-day on September 23, 2013, the day of the first hearing in this matter, which is why he was not paid for that time. Further, Mr. Anderton stated that there has been no change in Mr. Salazar's hourly rate for the last 6 months, and that he was denied the opportunity to work overtime a few days last week when there was "confusion."

Mr. Reuben Landaverde also testified before the Court, and stated that he works for A&A as a foreman.  Mr. Landaverde knows Mr. Salazar, and knew him when they lived in Mexico. Mr. Landaverde testified that he was present at the meeting, and that Mr. Salazar and Mr. Ruiz were not threatened in any way during the conversation.  Mr. Landaverde testified that Mr. Salazar and Mr. Ruiz both report to him, and that they were both good employees and hard

workers.  Mr. Landaverde testified that he is in the United States on an HB-2 visa, and that his visa expires in December of 2013.  He is hoping that his visa will be extended and that he will continue living in the United States and working for Defendants.

## LEGAL STANDARD

"When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions."  *Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997) (citing *Chambers*, 501 U.S. 32, 50 (1991)); *Toon v. Wackenhut Corrections Corp.*, 250 F.3d 950, 952 (5th Cir. 2001).  "A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees."  *Carroll*, 110 F.3d at 292-93.  "The court must make a specific finding of bad faith."  *Toon*, 250 F.3d at 952 (citation omitted).  Courts may make credibility determinations to resolve whether such misconduct has occurred.  *See Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 808-09 (5th Cir. 2003).  "Furthermore, '[i]f there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first."  *Id*. at 952-53 (citing *Natural Gas Pipeline Co. of America v. Energy Gathering, Inc*., 86 F.3d 464, 467 (5th Cir. 1996)).

## ANALYSIS

Plaintiffs argue that Defendants offer four different versions of the facts at issue in this case: (1) during a conference call with the Court, Defendants' counsel stated that Mr. Salazar was not confronted at any time, and it was Mr. Salazar who volunteered to the company that he did not sign the consents; (2) Mr. Anderton testified that he approached Mr. Salazar, but only did so with good cause because he had taken Mr. Salazar's signatures, compared them, and made the

subjective determination that they were fraudulent; (3) Mr. Anderton also testified that after he saw the first signature alone, he determined that the signature was not Mr. Salazar's and approached him on this basis; and (4) Mr. Anderton stated that the signature was signed on the second page of the document, and not on the consent page, so Mr. Anderton was merely curious as to whether Mr. Salazar wanted to be part of the lawsuit at all.  Plaintiffs contend that regardless of which version is true, that Defendants never should have communicated with Mr. Salazar or Mr. Ruiz regarding the lawsuit, and instead, if there was a question about the consent forms, Defendants should have followed the appropriate protocol and filed a motion or telephoned Mr. Salazar's counsel to discuss the issues.  Plaintiffs also argue that represented parties deserve protection from the Court from inherent pressure placed on them by the President of a company.

Defendants contend that they did file a motion disclosing everything that is going on here, including the confusion created by Mr. Salazar stating that he did not sign the consents and that he did not want to be part of the lawsuit.  Defendants argue that they had a good faith basis to challenge the consents, and did so in the appropriate manner.  Defendants contend that surely Mr. Anderton had a right to merely ask whether Mr. Salazar was involved in the lawsuit.

The Court finds that the facts in this case are clear.  Mr. Anderton approached Mr. Salazar, twice through his representative Mr. Landaverde, and once in person to inquire of him whether or not he was involved in the lawsuit.  This repeated contact between Mr. Anderton, the President of the company that Mr. Salazar and Mr. Ruiz work for, is inherently coercive in nature.  "In general, communications that are litigation-netural-that do not alter the legal relationship between the defendants and members of a putative class-are not subject to restriction.  However, courts have a responsibility to restrict communications that are potentially

coercive or misleading." *Zamboni v. Pepe West 48th Street LLC*, No. 12 Civ. 3157(AJN)(JCF), 2013 WL 978935, at *3 (S.D.N.Y. March 12, 2013) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 104 (1981)).  In circumstances where there is an ongoing and unequal business or employment relationship between the parties, this type of communication may be considered inherently coercive. *Zamboni*, 2013 WL 978935, at *3 (citations omitted).  "Furthermore, a communication may be coercive where the defendant interferes with participation by potential class members in the lawsuit or misleads them by failing to reveal how some proposed transaction might affect their rights in the litigation." *Id.*

"[U]nsupervised contacts with putative class members, which result[] in those members signing affidavits expressing a lack of interest in participating in this action without the advice of independent counsel or the benefit of a court-approved notice, are cause for serious concern." *Gortat v. Capala Bros., Inc.*, No. 07-CV-3629(ILG)(SMG), 2009 WL 3347091, at *11 (E.D.N.Y Oct. 16, 2009) (citations omitted).  The Court agrees with Plaintiffs' assertion that if Defendants had questions or a good faith basis to challenge the consents filed by Plaintiffs, then they should have filed a motion with the Court and let the Court conduct a hearing regarding the opt-in Plaintiffs' desire to participate in the lawsuit.   Although Defendants assert that they did file a motion, there is no such motion on the docket.  Defendants filed a response to Plaintiffs' motion for leave to file additional consents, and included a suggestion of fraud.  However, Defendants also had already obtained and attached to their response the false affidavits signed by Mr. Salazar and Mr. Ruiz.  At this point, the damage was already done, and the effect of Mr. Anderton's communications with Mr. Salazar and Mr. Ruiz was to cause both of them to fear for their jobs. Mr. Ruiz has indicated that he no longer wants anything to do with this lawsuit because he is so

scared.  This situation is particularly illustrative of the chilling effect that these types of improper communications by an employer can have on an employee pursuing his rights under the FLSA.

Therefore, the Court finds that in order to protect the opt-in Plaintiffs from further improper communications by Defendants, Plaintiffs' motion for sanctions should be granted. Plaintiffs have also filed a motion for attorneys' fees,[2] and the Court will take up the issue of an award of attorneys' fees in considering that motion.

## CONCLUSION

It is **ORDERED** that Plaintiffs' Emergency Motion for Sanctions (Dkt. #33) is **GRANTED**.

It is **ORDERED** that Defendants are prohibited from any further communication with any Plaintiffs regarding this litigation.  Defendants are also prohibited from taking any adverse employment action against any Plaintiffs in this litigation, and are prohibited from evicting any Plaintiffs in this litigation from their homes.  The Court will address the issue of attorneys' fees in connection with Plaintiffs' motion for attorneys' fees.

**SIGNED this 16th day of October, 2013.**

AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE

---

[2] Currently docket entry number 43 and 44.